Position of the Chinese Government on the Unwarranted Lawsuit
Filed by Wang Dan and Wang Juntao

Regarding the unwarranted lawsuit filed by Wang Dan and Wang Juntao to the United States District Court for the District of Columbia (hereinafter referred to as the US court) against the Chinese state leader, the *People's Daily*, and the *Global Times* and a correspondent of the *People's Daily* formerly posted to the United States, the Chinese Government wishes to state its position as follows:

1. The US court has no jurisdiction over the Chinese state leader.

(1) Sovereign immunity, as a principle of customary international law, is derived from the principle of equality among sovereign states. The principle of equality among sovereign states is the cornerstone of modern international law, which is explicitly enshrined in many important international legal instruments including the *Charter of the United Nations*. Under the legal principle of "Par in parem non habet jurisdictionem" (between equals there is no jurisdiction), a sovereign state is immune from the jurisdiction of the courts of another sovereign state. The state in question would not be in a position to invoke jurisdictional immunity if and only if it declares an express waiver of its jurisdictional immunity, or initiates a proceeding before a court of foreign jurisdiction or there is a counter-claim arising from the same legal relationship or facts as the principal claim.

(2) The principle of sovereign immunity was universally accepted by states in their judicial practices as early as in the 19th century. The United States was among the first states to apply this principle. Both the *Case of Schooner Exchange v. McFadden* heard by the US Supreme Court in 1812 and many other cases tried by US courts thereafter reaffirmed this principle. Sovereign immunity was also reaffirmed as an important principle in the *Foreign Sovereign Immunities Act (FSIA)* adopted by the United States in 1976. In modern state-to-state relations, sovereign immunity is a universally recognized principle of international law and is widely supported by legislative and judicial practice of states and international legislation.

(3) While the definition of "State" may vary from state to state, the generally accepted practices are that head of state, head of government, foreign minister and other state officials enjoy jurisdictional immunity. The head of state, being the highest representative of a state both internally and externally, enjoys absolute jurisdictional immunity which

is the same as diplomatic privilege and immunity and is not subjected to the jurisdiction of any foreign courts. As a principle of customary international law, the personal jurisdictional immunity of head of state had been established and existed long before the principle of sovereign immunity was introduced. This principle is practiced by the United States and other countries.

2. The US courts have no jurisdiction over The *People's Daily* and its former US-based correspondent.

(1) The *People's Daily* is a State agency of China and its property is owned by the State. Its funding is covered by the State budget. Its main functions include releasing State and government documents, news and government views and publicizing information of the State. It therefore enjoys sovereign immunity under international law.

(2) Even under the 1976 *Foreign Sovereign Immunities Act* of the United States, the *People's Daily* is also "an agency or instrumentality of a foreign state" and enjoys sovereign immunity. In the case of *Wang Bingzhang v. Renmin Ribao(People's Daily)* in 1988, the US court affirmed the immunity of the *People's Daily*.

(3) As the *People's Daily* enjoys sovereign immunity, its former US-based correspondent also enjoys immunity in performing duties.

3. It is the Chinese judicial organs which are the proper authorities for handling cases related to media activities taking place in China.

The *Global Times* is an independent corporate registered in China in accordance with Chinese laws. It is registered at the Chaoyang branch of the Beijing Administration of Industry and Commerce as *Global Times*, and its registration number is 1101051232686. The *Global Times* and the *People's Daily* are separate entities. The *Global Times* is independent in operation, tax payment and assuming legal responsibility. The newspaper is circulated only in China and is not sold overseas. Any dispute in relation to articles published by the *Global Times* comes under the jurisdiction of Chinese judicial organs.

CA Form 1

# Superior Court of the District of Columbia

## CIVIL DIVISION

500 Indiana Avenue, N.W.
Telephone: 727-1790

WANG BINGZHANG, M.D., Ph. D,
ET AL
*Plaintiff*

vs.

CHINA BOOKS AND
PERIODICALS, INC.
2429 24TH STREET
SAN FRANCISCO, CALIF. 94110

CA **8645-85**

Civil Action File No. _____

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the Answer with the Court either before service or within nve (5) days after you have served it. The Answer must be filed in Room JM 220 at 500 Indiana Avenue, N.W. between 9:00 a.m. and 4:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 Noon on Saturdays, but not on Sundays or holidays.

IMPORTANT: IF YOU FAIL TO SERVE AND FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OF IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (NA-8-1161) or the Neighborhood Legal Services (628-9161) for help or come to Room JM 220 at 500 Indiana Avenue, N.W. for more information concerning places where you may ask for such help.

THOMAS A. DUCKENFIELD
*Clerk of the Court*

ROBERT A. ACKERMAN
Name of Plaintiff's Attorney

1250 FOURTH STREET, S.W, No. 504W
WASHINGTON, D.C. 20024
Address

(202) 554 2908
Telephone

Date: 11/25/85

PUEDE OBTENERSE COPIAS DE ESTE FORMULARIO EN ESPANOL EN EL TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA, 500 INDIANA AVENUE, N.W., SALA JM 220
YOU MAY OBTAIN A COPY OF THIS FORM IN SPANISH AT THE SUPERIOR COURT OF D.C., 500 INDIANA AVENUE, N.W., ROOM JM 220

Form CV.1: 466 Aug 1.
82-66.5 7

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

Civil Division

WANG BINGZHANG, M.D., PH. D,                    )
9453 Cloverdale Court                           )
Burke, Va. 22015, and also                      )
c/o Chinese Alliance for Democracy)
P.O. Box 243                                    )
Rockefeller Center                              )        CA 8645-85
New York, New York 10185                        )
                                                )        Civil Action No.
          and                                   )
                                                )
BELL M.S. WONG                                  )
3501 S. Jefferson Street                        )
Bailey's Crossroads, Va. 22041                  )
                                                )
          and                                   )
                                                )
TOM TZONG                                       )
2500 Columbia Pike                              )
Arlington, Va.  22204                           )
                                                )
          and                                   )
                                                )
LUN WONG                                        )
1407 Carkin Street                              )
San Francisco, Calif. 94109                     )
                                                )
          Plaintiffs                            )
                                                )
          v.                                    )
                                                )
RENMIN RIBAO, known in English as               )
THE PEOPLE'S DAILY NEWSPAPER                     )
2 Jintai Road West                              )
Beijing, China, and also                        )
c/o Mr. Zhang Liang                             )
3706 Massachusetts Avenue, N.W.                 )
Washington, D.C. 20016                          )
                                                )
          and                                   )
                                                )
CHINA BOOKS AND PERIODICALS, INC.               )
2929 24th Street                                )
San Francisco, Calif. 94110                     )
                                                )
          and                                   )
                                                )
DENG LIQUN                                      )
c/o Renmin Ribao Publishing House               )
2 Jintai  Road West                             )
Beijing, China                                  )
                                                )
          and                                   )
                                                )
QIN CHUAN                                       )
c/o Renmin Ribao Publishing House               )
2 Jintai  Road West                             )
Beijing, China                                  )
                                                )
          and                                   )
                                                )
CUI CHEN                                        )
c/o Renmin Ribao Publishing House               )
2 Jintai  Road West                             )
Beijing, China                                  )
                                                )
          and                                   )

LI ZHUANG                                )
c/o Renmin Ribao Publishing House        )
2 Jintai Road West                       )
Beijing, China                           )
                                         )
            Defendants                   )
                                         )

## COMPLAINT

### (Libel)

1.  Jurisdiction herein is founded on District of Columbia Code
Title 13, §423. Acting directly themselves and by agents within the
District of Columbia the defendants transact business in the District
of Columbia in that they regularly publish and distribute a news-
paper within this jurisdiction for which they receive payment from
purchasers here. The defendants also contract to supply services
here in that they contract to supply a newspaper regularly to sub-
scribers who wish this service to be provided by defendants within
this jurisdiction and who pay for this service. The defendants
furthermore caused tortious injury in the District of Columbia by
acts within this jurisdiction.

2.  Plaintiff WANG BINGZHANG is a physician and leader of the
China Spring democracy movement, an organization dedicated to the
strengthening of democratic principles in China and to improving the
human rights situation there. He is a surgeon and a 1971 graduate
of Beijing (Peking) Medical College who was sent by the People's
Republic of China in 1979 to McGill University, Montreal, for ad-
vanced medical training leading to a Ph. D. degree in 1982. Upon
completion of the program he traveled to the United States in 1982,
and has dedicated himself thereafter to mobilizing students and
scholars from the People's Republic of China and overseas Chinese
to promote the growth of democracy and improve the human rights
situation in China. He has done so as leader of the China Spring
democracy movement, a small organization which publishes a journal
named China Spring.

3.  Plaintiff BELL M.S. WONG is an activist in the China Spring
democracy movement. He emigrated to the United States from Hong
Kong and expects to become a naturalized United States citizen in
1986. He is the owner of three Chinese restaurants.

4.  Plaintiff TOM TZONG is an activist in the China Spring
democracy movement. He emigrated to the United States from Taiwan

and owns a Chinese restaurant near the District of Columbia.

5.  Plaintiff LUN WONG is an activist in the China Spring demo-cracy movement.  He is a refugee from mainland China and is now a United States citizen.

6.  Defendant RENMIN RIBAO (hereinafter the "People's Daily") is a prominent publication of the Chinese Communist Party.  As stat-ed in its daily editions, it is published by the Renmin Ribao Pub-lishing House, 2 Jintai Road West, Beijing, China.  The People's Daily and that publishing house receive funds produced by the sale of subscriptions to and advertisements in the People's Daily in the District of Columbia and derive substantial revenue from services rendered in this jurisdiction.

7.  Defendant CHINA BOOKS AND PERIODICALS, INC. is a corporat-ion organized under the laws of the State of California for profit making purposes.  Its principal place of business is located at 2929 24th Street, San Francisco, California 94110.  CHINA BOOKS AND PERIODICALS, INC. prints and distributes over 20,000 copies daily of the People's Daily in the District of Columbia and elsewhere through out the United States for profit, soliciting paid advertisements and subscriptions therefor and receiving substantial revenue from such services rendered in the District of Columbia.

8.  Defendant QIN CHUAN is the Director of the People's Daily and a member of the Central Committee of the Chinese Communist Party.  Upon information and belief, he is a resident of Beijing, China.

9.  Defendant CUI CHEN is a reporter for the People's Daily whose name appeared therein as the author of an article published in the District of Columbia on about December 13, 1984 under the title "My Impressions About Mr. Jiang Nan", which is a well known pen name for Henry Liu.  An English language translation of that article is contained in Exhibit I hereto.  A copy of the original Chinese lan-guage article is contained in Exhibit II.

10.  Henry Liu was a Chinese American writer of United States nationality.  In books and in articles for a Chinese language San Francisco newspaper he had been critical of the Nationalist Republic of China Government on Taiwan.  On about October 15, 1984 Henry Liu was shot to death by Chinese assassins in the garage of his San Fran-cisco home, as was widely reported in this jurisdiction and else-where in the United States.

11.  Defendant LI ZHUANG is editor-in-chief of the People's

Daily.

12. Defendant DENG LIQUN is Secretary of the Secretariat of the Central Committee of the Chinese Communist Party and functions as chief of propaganda for the Chinese Communist Party, responsible for the information published in the People's Daily.

13. The above described People's Daily article was intended by defendant People's Daily and the other defendants to be understood by readers in this jurisdiction to whom it was addressed to state, and was understood by readers in this jurisdiction and elsewhere in the United States to state, as follows:

a. That in his writings Henry Liu had denigrated the China Spring democracy movement developed by Dr. WANG BINGZHANG and the others in his organization and had asserted that American soil would not bear the fruit of China's democracy;

b. That the "so-called democracy movement" of Dr. WANG BINGZHANG was subsidized by the Taiwan government;

c. That Dr. WANG BINGZHANG and the others in the China Spring democracy movement were "hypocrites who deserted their mainland wives and children in order to look for new lovers";

d. That Dr. WANG BINGZHANG and the others in the China Spring democracy movement were "swindlers who used patriotism as a pretext to racketeer overseas Chinese so as to feather their own nest"; and

e. That Dr. WANG BINGZHANG and the others in the China Spring democracy movement were "political prostitutes who are befuddled by fame and gain in their politicl speculation".

14. The statements in the People's Daily article authored by CUI CHEN that Henry Liu had written the things set out above were false, unfair, inaccurate and defamatory on their face of Dr. WANG BINGZHANG and of the other plaintiffs in the China Spring democracy movement.

15. The following false statements in the article adversely reflected on Dr. WANG BINGZHANG's abilities in his profession as a physician and in his profession as a movement leader dedicated to fostering the growth of democratic principles and improving the human rights situation in China:

- 4 -

a. That Henry Liu had stated in his articles that Dr. WANG BINGZHANG and the others in the China Spring democracy movement were "hypocrites who deserted their mainland wives and children in order to look for new lovers";

b. That Henry Liu had stated in his articles that Dr. WANG BINGZHANG and the others in the China Spring democracy movement were "swindlers who used patriotism as a pretext to racketeer overseas Chinese so as to feather their own nest";

c. That Henry Liu had stated in his articles that Dr. WANG BINGZHANG and the others in the China Spring democracy movement were "political prostitutes who were befuddled by fame and gain in their political speculation".

16. The false statements in paragraph 15 above as to the other in the China Spring democracy movement were of and concerning China Spring movement activists BELL M.S. WONG, TOM TZONG, and LUN WONG. Those who know them would understand and did understand that they were persons referred to in the article as others in Dr. WANG BING-ZHANG's China Spring democracy movement.

17. The false statements in paragraph 15 above did serious damage to defendant BELL M.S. WONG, TOM TZONG, and LUN WONG by reflecting adversely on their abilities in their business and trade as restaurant operators.

18. The following false statements in the People's Daily article assert that Dr. WANG BINGZHANG and BELL M.S. WONG, TOM TZONG and LUN WONG as others associated with him in the China Spring democracy movement were guilty of crimes involving moral turpitude:

a. That Henry Liu had stated in his articles that Dr. WANG BINGZHANG and the others in the China Spring democracy movement had "deserted their mainland wives and children in order to look for new lovers";

b. That Henry Liu had stated in his articles that Dr. WANG BINGZHANG and the others in the China Spring democracy movement were "swindlers who used patriotism as a pretext to racketeer overseas Chinese so as to feather their own nest", and that "they were political prostitutes".

19. The false statement that Henry Liu had written that the

- 5 -

China Spring democracy movement headed by Dr. WANG BINGZHANG was
subsidized by Taiwan was intended to convey and did convey to read-
ers that Dr. WANG BINGZHANG's democracy movement was receiving a
financial subsidy from the Republic of China Government on Taiwan,
formerly headed by Chiang Kai-Shek and now headed by his son,
Chiang Ching-Kuo, whom Henry Liu had critized in his articles.

20.  Defendants CUI CHEN, People's Daily, CHINA BOOKS AND
PERIODICALS, INC., Director QIN CHUAN, editor-in-chief LI ZHUANG and
propaganda chief DENG LIQUN published the above defamatory state-
ments with actual malice; with knowledge that they were false,
unfair, inaccurate and defamatory; with reckless disregard as to
whether they were true or false, unfair, inaccurate and defamatory;
and with serious doubts as to whether they were true or were false,
unfair, inaccurate and defamatory.

21.  The Chinese Communist Party, of which defendants People's
Daily, CUI CHEN, LI ZHUANG, and DENG LIQUN are responsive elements,
considers Dr. WANG BINGZHANG's activities as leader of the China
Spring democracy movement to be counter-revolutionary and anti-party.
Former Ambassador ZHANG WENJIN of the People's Republic of China
to the United States, who is a member of and responsive to the
Chinese Communist Party, has called Dr. WANG BINGZHANG a traitor.
The People's Daily considers Dr. WANG BINGZHANG and the other in the
China Spring movement as political enemies to be denigrated through
propaganda; in serving its propaganda objectives the People's Daily
showed reckless disregard for the truth of the People's Daily's
statements converning Dr. WANG BINGZHANG and others in the China
Spring democracy movement.

22.  Defendants published the above false statements with the
intent and for the purpose of injuring plaintiffs in their personal
and professional reputations, of lowering the esteem in which they
are held, and of holding them up to scorn, contempt, ridicule, shame
and embarrassment.

23.  As a natural and direct result of the publication of the
untrue statements falsely attributed to Henry Liu in the People's
Daily edition distributed within the District of Columbia and else-
where in the United States, plaintiffs have suffered serious damage
to their personal and professional reputations.  As a result thereof
they have suffered personal humiliation, have been held up to

- 6 -

scorn, contempt, and ridicule, and have suffered great emotional anguish.

24. As a further result of the publication of the above defamatory statements plaintiffs have suffered pecuniary loss as a result of the damage done to their reputations.

WHEREFORE, plaintiffs respectfully pray that the Court award them the following relief:

a. Judgment in favor of each of the plaintiffs against each defendant, and all of them, jointly and severally, in the amount of $ 10,000,000.00 compensatory damages;

b. Judgment in favor of each of the plaintiffs against each defendant, and all of them, jointly and severally, in the amount of $ 10,000,000.00 punitive damages.

c. Judgment in favor of each of the plaintiffs for the costs of this action, including attorney's fees;

d. Interest on all amounts awarded; and

e. Such other relief as to the Court may seem just and proper.

JURY DEMAND: Plaintiffs demand trial by a jury on all issues.

Respectfully submitted,

Robert A. Ackerman 37200
1250 Fourth Street, S.W. No. 504W
Washington, D.C. 20024
Tel. (202) 554 2908
Attorney for Plaintiffs

- 7 -

EXHIBIT I

## MY IMPRESSIONS ABOUT MR. JIANG NAN
### (Translation from original Chinese language)

Jiang Nan always concerned himself with the destiny of his homeland. He jubilantly admired the various reforms carried out by our Party after its Third Plenary Session of the Eleventh Central Committee. What commanded his greatest admiration was the two "civilizations". He said that, so far as as nation, a family, or even an individual, was concerned, sheer abundance in material comfort, i.e., material civilization, was not enough; it must be complemented with rich spiritual life. When Wang Baochai made her abode in a shabby cave-house, materially speaking, her life was miserable enough, but spiritually speaking, her life was full of meaning. Compared to a rich young lady of a ranking official's family, Wang was obviously a happy woman. In comparison with other countries in the world, China was uniquely endowed with a good foundation and advantageous conditions for the building up of spiritual civilization; therefore, China is supposed to build up material civilization at a faster speed than Western Europe and North America. This penetrating insight of his has been confirmed by an increasing number of instances.

More than once, Jiang Nan told me, "No matter how hard the Kuomingtang brags, it is still incomparable to the Communist Party in kindness and humanity. On mainland China, memorial meetings are held in honor of those who died as a result of persecution, and those who were wrongly treated are rehabilitated. That's really something! Old Chiang, however, killed so many people, created so many false, erroneous and framed-up cases, but did he ever admit his mistakes? No, he never repented at all." Here we may well say that Jiang Nan is a friend of ours who kept pace with us con-

sciously, but not blindly.  While consistently refusing to have
any dealings with those "independent Taiwan" elements, he turned
up his nose at their flattery and their attempts to rope him in.
As to the China Spring democracy movement developed by Wang Bing-
zhang and others, he taunted it in his articles, asserting that
the American soil would not bear the fruit of China's democracy,
and pointing out that their so-called "democracy movement" which
was subsidized by Taiwan was a complete irony of modern Chinese
history.  He said that these people, to put it bluntly, were
hypocrites who deserted their mainland wives and children in order
to look for new lovers; that they were swindlers who used patriotism
as a pretext to  racketeer overseas Chinese so as to feather their
own nest; that they were a pack of political prostitutes who were
befuddled by fame and gain in their political speculation.

I remember it was also in July or August of 1982 that Jiang
Nan read an article in which Shanghai's Liberation Daily conducted
self-criticism of its having printed an erroneous piece of writing
in the newspaper.  Without delay he managed to get the original
article and read it carefully.  He argued that it was illogical
to draw a line between the proletariat and the bourgeoisie in res-
pect of the courtesy of social association; and that in reality
it could only serve to weaken the effect of the ongoing campaign
of the "Five Attentives" and the "Four Beautifuls".  But he could
not tolerate the mistaken conceptions that emerged in the minds
of some mainland youths as a result of their  bewilderment over
the superficial prosperity in Taiwan.  After the convening of the
Sixth Plenary Session of the Eleventh Central Committee, Jiang Nan
once happened to read an article in a Hong Kong magazine in which
the author blindly bragged about the present situation in Taiwan,

He became very angry, and for the first time he told me excitedly that the actual situation in Taiwan was best known to those who had lived there before. You know, he added, how the KMT behaved on the mainland. Yet, their behavior became even worse after they fled to Taiwan. In Shandong province, there was a middle school principal who took a group of students to Taiwan along with Chiang Kai Shek's army. Having realized that they were taken in, the students required one after another that they be allowed to go home. When both threat and seduction failed, the Taiwan authorities ordered arrest of those teenagers at night who were later thrust into sacks and dumped into the sea. I was having some interviews on Jinmen Island at that time. When I talked with my friends who were aware of that incident, none of us did not shed tears.

Jiang Nan hated the rampage of secret agents in Taiwan all the more. He reclled that Wu Guozhen went into conflict with Chiang Ching Kuo and was subsequently squeezed out of Taiwan just because he objected to the infiltration of secret agents into the army. Jiang Nan began to revere Wu's personality right after that. But, with all his understanding and personal experience, why Jiang Nan, a man of such extraordinary wisdom, still could not avoid being murdered? In my opinion, what accounts for that is his blind faith in the American legal system which led to the relaxation of his vigilance. But, more importantly, it is because of his opponents decadence and cruelty, which Jiang Nan never expected while he was alive.





石

## 江南先生印象记

莫庆

江南时时关怀着祖国的命运，对于我党中央在十一届三中全会以来所实行的种种改革是心悦诚服、欢庆鼓舞的。最让他钦佩的是两个"文明"口号的提出。他说，一个民族、一个家庭，乃至一个人，光有丰富的物质享受，即物质文明是不行的，还必须有丰富的精神生活。王宝钏坐寒窑，物质生活很低，精神生活却是充实的，同相府里的千金小姐生活相比，前者显然是幸福的。同世界其它国家相比，中国的精神文明建设有着得天独厚的基础和条件，因而物质文明的建设速度也应快于西欧、北美地区。他的这一真知灼见，已经为愈来愈多的事例所证实。他还不止一次地同我讲，"不管国民党怎样吹，还是不如我产党好，通人情。大陆今天为这个开追悼会，明天为那个平反昭雪，真了不起。老蒋杀了那么多人，制造了那么多冤、假、错案，何时认过错？他从来没有忏悔过。"可以说，江南同我们是自觉但又不是盲目地保持着一致的朋友。对于台独分子对他的奉承和拉拢，江南嗤之以鼻，坚持不同他们来往。对于以王炳璋等人搞起来的"中国之春"，他曾著文嘲讽，说在美国的土地上结不出中国的民主之果，指出他们接受台湾津贴进行所谓的"民主运动"，是对中国现代史的莫大讽刺，说穿了他们是抛弃大陆的婊女另寻新欢的伪君子，是借受国之名，行敲诈勒索之实以中饱私囊的江湖骗子，是一群名利熏心，搞政治投机的政治掮客。

记得也是在1982年7、8月份吧，他谈到上海的《解放日报》就曾刊登一篇错误文章所做的自我批评，又马上找本原文细看。他说，把人们之间交往的礼貌划分为资产阶级和无产阶级的，逻辑上是不通的，实际上，只能起到淡化正在开展的"五讲""四美"活动的作用。但对于大陆上有些青年人为台湾的虚假繁荣所迷惑，而产生的错误观念又不能为他所容忍。党的十一届六中全会后，他在一家香港杂志上看到有人盲目地吹嘘台湾现状，感到十分气愤，第一次同我激动地讲，台湾到底什么样子了，我们过来人最了解。国民党在大陆时的作为你们都知道，迁到台湾后更变本加厉。山东莱个中学的校长，带领一批学生随蒋军到台湾。后来一批学生发觉上当，纷纷要求返回家园。在威胁利诱诺告失败后，台湾当局下令在黑夜里逮捕这些尚不到廿岁的年青人，装在麻袋里全部投入了大海。当时我正在金门采访，同知道这件事的朋友谈起无不掉泪。对于台湾的特务统治，他更是深恶痛绝。他说吴国桢当年就是因为反对特工进入军队同蒋经国发生冲突，继而被排挤离开台湾的，从而对吴先生的人格产生景仰。但是，聪敏过人的江南医就对此有切身的体验和认识，为什么就没有躲过暗杀呢？我想这除了用他本人对美国统制的迷信，和放弃警惕来解释外，更主要的是由于他的对手的没落和凶残。这是江南生前所没有想到的。 （二）

石化城的夏夜是迷人的。

小城的一边，隔一条沪宁公路，广阔深沉的田野上，疏疏点点罄着几星灯火，仿佛颗颗火虫停在一块乌黑的地毯上，各种蛤虫合奏的田野交响曲，间或夹着几声犬吠，遥遥地传来。海边的大堤上也陆陆夜的深沉而没了散步、媚水的人群，只留下眨眼的航标陪伴阵阵涛声。静默的小城啊！

你若登上小城的最高处——金山宾馆的顶楼，迎着微风眺望，你会发现：小城笼罩在月光的朗照下，如一幅淡淡的写意图画，而这幅画的灵魂，是一艘船——一座船形的建筑，通体通明，静静地浮在浓墨的夜雾中，载着一船年青的水手，向一片探臭难测的海洋进发，那是石化工人文化宫。小城的文化中心。你若随着游客的步履，踏着夜浪前去寻访，你可以豢到主楼的大厅里，也许会遇有一位知名的作家或诗人在给导台千年轻的听众。二楼的作家里，文学创作组的成员正在静静地构思和写作，孕育着……

SUPERIOR COURT OF THE DISTRICT COLUMBIA

CIVIL DIVISION

WANG BINGZHANG, et al.,  )
          Plaintiffs,  )
                  )
      v.  )    Case No. CA-8645-85
RENMIN RIBAO, et al.,  )
          Defendants.  )
                  )
                  )

## MEMORANDUM ORDER

I.  The Status of the Parties to this Case.

      This action arises out of an article in
Renmin Ribao (People's Daily of the People's Republic
of China) which was published in its December 13, 1984
issue.  The plaintiffs who are, apparently, associated
with China Spring Democracy Movement allege that they
were libeled in that publication.  The article that is
alleged to have been libelous, among other things, is
alleged to have asserted that the China Spring
Democracy Movement is subsidized by the government of
Taiwan.

      The specific libelous article was, apparently,
written in the Peoples Republic of China (hereafter
PROC) where the newspaper was originally composed and
published.  The newspaper including the alleged
libelous article was distributed later in the United
States and the District of Columbia.  The plaintiffs
filed this action against Renmin Ribao (hereafter RR)
China Books and Periodicals, Inc., a California
corporation (hereafter CB&P) which distributes the
newspaper in the United States, Li Zhuang,
Editor-in-Chief, Qin Chuan, Director, Den Liqun,
Secretary and Cui Chen, reporter.  The plaintiffs and
CB&P have already entered into an agreement with
respect to the plaintiffs' Complaint, and this action
has been dismissed by the plaintiffs as to that party.

- 1 -

The question is whether the plaintiffs have perfected service of process as to the remaining defendants or any of them, for none of the remaining defendants have filed an Answer, or other responsive pleading, and the plaintiffs have requested a default against them and a trial as to damages only.

The defendant, CB&P, entered into a contract in September, 1981 (The Contract does not specify a day of September) with the defendant, Renmin Ribao Publishing House of 2 Jintaix:lu, Chaoyangmenwai, Beijing, People's Republic of China (hereafter RRPH) wherein CB&P was required on a daily basis to reprint from printing transparencies delivered to the San Francisco Airport, except for local publisher information and price, exact copies for each edition of RR and distribute them in the United States, Canada and South America. The price of RR was to be 20 cents per copy, with a semi-annual and annual subscription rates of 36 and $72.00, respectively. All proceeds from the sale of RR were to be remitted to RRPH. CB&P was to print each day the number of copies of RR as ordered by RRPH. CB&P was then to be paid 40% of the retail sales price for the number of copies printed and distributed plus a printing fee which was dependent also on the number of copies of RR that the publisher ordered printed.

The defendant, CB&P, filed a Motion to Dismiss wherein it asserted that:

1. RR under the Foreign Sovereign Immunity Act of the United States; 28 U.S.C. 1602 et seq. (FSIA) was immune for an action for libel and slander, and since CB&P as well as all of the individual defendants were acting on behalf of RR, they too were also immune from an action for libel and slander. CB&P asserted that otherwise the purpose of the FSIA in granting

- 2 -

immunity from such actions to a foreign state or its instrumentality or agency would be circumvented and frustrated. The primary and derivative immunity referred to by the defendant, CB&P, was based on 28 U.S.C. 1605(a)(5)(B).

2. This court lacked personal jurisdiction under its long arm statute (D.C. Code § 13-423 (1981) as to CB&P.

3. CB&P was entitled to immunity from a libel action such as this case, because it had no knowledge of the contents of the alleged libelous article complained of in this case and being an independent contractor had no duty to investigate the article to discover whether it contained any libelous statements.

4. This case should be dismissed as to Bell M. S. Wong, Tom Tzong and Lu Wong, for they are not mentioned in the article which is complained of in this case.

The defendant's, CB&P's, Motion and Memorandum of Points and Authorities in Support thereof, were filed by Eugene Theroux, Esquire and Thomas Peele, Esquire and argued by the former. These papers were informed, well prepared and comprehensive and, therefore, accorded substantial consideration. The plaintiffs resisted CB&P's Motion on all grounds and filed an equally impressive Opposition thereto. The defendant, CB&P, then filed a Reply consisting of 73-pages plus 22 attached Exhibits to the plaintiffs' Opposition. The plaintiffs then filed a 35-page Response to the defendant's, CB&P's Reply.

So far as relevant to the plaintiffs' Motion for Default, the court (Salzman, J.) denied the defendant's, CB&Ps, Motion to Dismiss. The Court also

- 3 -

stayed this case pending service by the plaintiffs on the remaining defendants under the provisions of Section 1608 of the FSIA. There were numerous and extensive efforts, thereafter, by the plaintiffs to effect service of process on the remaining defendants; and the plaintiffs now assert that service has now been effected. With no responsive pleading having been filed, plaintiffs assert that they are now entitled to proceed as to all remaining defendants by way of default.

The Chinese Communist Party (CCP) holds and exercises all sovereign state power in all of the domestic and foreign affairs of the PRC. RR is an organ of the CCP, so that it is, at least, an instrumentality of a foreign state, the PRC. The plaintiffs said at pp. 5-6 of their Opposition to the Defendant's, CB&P's, Motion to Dismiss:

> 5. Foreign Sovereign Immunities Act (FSIA) –
> Neither Renmin Ribao nor China Books is a
> "Foreign State."   China Books asserts that
> Renmin Ribao is an organ of the Central Committee
> of the Community Part of China.  Plaintiffs
> agree.  China Books asserts that the role of the
> Central Committee in the governance of the PRC is
> well known.  Plaintiffs agree.  Plaintiffs deny,
> however, China Books' implicit assumption that
> the Chinese Communist Party is a "foreign state"
> within the FSIA.  Plaintiffs deny that the
> Secretariat of the Central Committee of the
> Chinese Communist Party is such a "foreign
> state".  The well known role of the Communist
> Party and its Central Committee in the governance
> of China is that the party totally dominates the
> government.  However, the Party and the
> Government are two separate structures.  This is
> nowhere more so than in the thinking of the
> Party.

- 4 -

Exhibit IV attached to the plaintiffs' Opposition

provides:

### The Secretariat

Actually runs the day-to-day affairs of China Headed by the General Secretary.

This Exhibit also provides:

### Where the Power Lies in China

The Chinese Communist Party holds all political power, centered in the Politburo and the Secretariat of the Central Committee.  All the important decisions – in foreign policy, the economy and social affairs – are made there and carried out by the Government, known as the State Council, and by the nominal legislature, the National People's Congress, which lacks independent power.

On or about May 6, 1986, the PRC lodged with the United States Embassy in Beijing the following diplomatic Note:

The Ministry of Foreign Affairs of the People's Republic of China presents its compliments to the Embassy of the United States of America in China and wishes to state the following:

On December 14, 1985, the Ministry of Foreign Affairs of the People's Republic of China made representations to the U.S. side in regard to Wang Bingzhang and others levelling charges in a U.S. court against the People's Daily of China and leading members of the departments concerned for the purpose of carrying out anti-Chinese Government political actvities of Wang Bingzhang and others have not been stopped as yet.  For this, the Chinese Government hereby expresses its regret.

The Chinese Government restates that by permitting Chinese citizens to openly engage in anti-Chinese Government activities on U.S. territory, the U.S. Government has completely violated the accepted basic norms governing international relations.  The Chinese Government is following seriously the development of this case.

Moreover, the Chinese side wishes to call the attention of the U.S. Government to the fact that the political system of China has its own characteristics as distinct from those of other countries.  The Communist Party of China is the ruling Party and the core of leadership for all China.  The People's Daily, being an organ of the Chinese Communist Party, exercise the function of publicity and education for the Chinese Communist Party and the state of the People's Republic

– 5 –

of China. It announces the foreign and domestic policies of the Chinese Government and publishes its important documents. The property of the People's Daily is state-owned, and it is funded by the Ministry of Finance of the People's Republic of China. According to accepted principles of international law, the People's Daily should enjoy sovereign immunity in U.S. courts. In the view of the Chinese side, the U.S. court in question has no right to accept and hear the case.

Once again, the Chinese Government asks the U.S. Government to take effective measures promptly to stop Wang Bingzhang and others from carrying out anti-Chinese Government political activities in the United States, to convey the aforesaid position of the Chinese Government to the U.S. court concerned and to urge it to abandon immediately the proceedings against the People's Daily and leading members of the Chinese Departments concerned, so that the situation regarding this case will not deteriorate to the detriment of Sino-U.S. relations.

The Foreign Ministry of the People's Republic of China avails itself of this opportunity to renew to the U.S. Embassy the assurance of its highest consideration. Beijing, May 6, 1986.

Under the FSIA, an instrumentality or agency of a foreign state is defined as: (18 U.S.C. .1603)

> (b) An "agency or instrumentality of a foreign state" means an entity—
> (1) which is a separate legal person, corporate or otherwise, and
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

It is clear that the remaining defendants who are individuals are not instrumentalities or agencies of a foreign state, for they are not an organ of a foreign state but at most are employees of an instrumentality or agency of a foreign state.

- 6 -

It is equally clear, however, that RR is an instrumentality or agency under the FSIA, so that the plaintiffs request for default must be evaluated as to each defendant on the basis of the respective status of each defendant.

II. **Efforts to Serve Process.**

1. On November 29, 1985, plaintiffs' counsel deposited with the U.S. Postal Service envelopes properly addressed in both English and Chinese to each of the remaining defendants. Each envelope contained a summons for the defendant to whom the envelope was addressed plus a copy of the Complaint, together with a translation to Chinese for each document. The envelopes, however, were forwarded by the U.S. Postal Service without a request for a signed receipt. Pursuant to inquiry made by plaintiffs' counsel the Postal Service reported that it had been informed by the Chinese authorities that as to the envelopes addressed to RR Director Qin Chuan, RR, Den Liqun and Li Zhuang, they had been delivered to the proper person, but the envelope addressed to Reporter Cui Chen together with its contents had been confiscated, because the contents were prohibited in the mails of the country of destination. As reflected in the Diplomatic Note of May 6, 1985, the Chinese government on December 14, 1985 protested to the U.S. Embassy in Beijing with respect to the pendency in this court of this action.

2. On May 6, 1986, the plaintiffs' attorney deposited with the U.S. Postal Service a separate envelope properly addressed in both English and Chinese to each of the remaining defendants. Each envelope contained a summons for the named addressee with a copy of the Complaint, both with Chinese

- 7 -

translations.  These envelopes were forwarded by registered mail which required that a receipt be signed by the recipient of each of the envelopes and that the signed receipt be returned by the Postal Service to the sender.  Neither envelopes nor signed receipts have ever been received back by the sender.

3.  Pursuant to plaintiffs' counsel's request, the Clerk's Office of this court deposited on June 14, 1986 with the U.S. Postal Service, postage prepaid, an envelope properly addressed in English and Chinese to each of the remaining defendants.  Each of these envelopes contained a summons to the addressee and a copy of the Complaint, each in both English and Chinese.  These envelopes were forwarded by the Postal Service by registered mail which required that a receipt be signed by the recipient of each of the envelopes and that it be returned to the Clerk's Office.  Neither the envelopes nor signed receipts have ever been received back by the Clerk's Office.

4.  Pursuant to plaintiffs' counsel's request, the Clerk's Office deposited on September 15, 1986, with the U.S. Postal Service, postage prepaid, five (5) envelopes each addressed in both Chinese and English to the Minister of Foreign Affairs, Ministry of Foreign Affairs, Beijing, China and each contained in both English and Chinese a Summons, a copy of the Complaint and a notice of suit.  Each envelope was transmitted by registered mail which required the recipient of the envelope to sign a receipt for the envelope and that the receipt be returned by the Postal Service to the sender.  Neither the envelope nor a receipt has ever been received back by the Clerk's Office as to any of these envelopes.

- 8 -

5.  On October 23, 1986, pursuant to plaintiffs' counsel's request, the court's Clerk's Office deposited with the U.S. Postal Service, postage prepaid, five (5) envelopes each being addressed to the proper office of the U.S. State Department for service under the FSIA and each containing a letter requesting that its contents consisting of two (2) Summons, two (2) copies of the Complaint and two (2) copies of the Notice of Suit in both English and Chinese and four (4) English copies of the FSIA be delivered through diplomatic channels and pouch to PRC Ministry of Foreign Affairs.

The U.S. State Department in its letter of December 30, 1986, to counsel for the plaintiffs informed that it declined to forward the contents of all of the envelopes through diplomatic channels and pouch, for the Department of State had determined that none of the remaining defendants was a "state" within the meaning of the FSIA.

6.  On February 11, 1987, the Deputy Chief Editor for RR, Mr. Fan Rong Kang, was travelling in this country, and at the direction of counsel for the plaintiff, a special process server handed to him at LaGuardia Airport English and Chinese copies of the Summons and Complaint in this action.  Then 2-1/2 hours later another so called special process server pursuant to the instructions of counsel for the plaintiffs, served on Mr. Kang at Dulles Airport English and Chinese copies of the Summons to RR, Complaint, Notice of Suit and the FSIA.  The plaintiffs allege that Mr. Kang is a leading officer of RR, is the third ranking officer of RR and is responsible for its U.S. edition.

- 9 -

7.  The plaintiffs then requested an Order from this Court directing the U.S. State Department to transmit to the PRC Ministry of Foreign Affairs through diplomatic channels the contents of the envelopes which had been previously sent to it by the Clerk's Office, but since neither the U.S. State Department nor the United States nor any officer or employee of either was before the court, the court denied this requested order.

8.  The plaintiffs then requested an order from the court permitting service on the remaining defendants in a manner consistent with the Code of Civil Procedure of the PRC.  The court denied this request and instead entered an order permitting the service of process on the remaining defendants in the PRC in accordance with the provisions of the Code of Civil Procedure of the PRC.  The Code of Civil Procedure of the PRC requires proof of service by signed receipt by the person to be served.  The plaintiffs asserted that service consistent with the Code of Civil Procedure of the PRC would permit proof of service not only by signed receipt but by other evidence which is sufficient to reasonably show even without a signed receipt from the person to be served that process was in fact nonetheless delivered to that person.  In any event, the plaintiffs concede that they were unable to effect service of process in accordance with the Code of Civil Procedure of the PRC and presumably not even consistent with that Code of Civil Procedure, for they have not asserted that service was effected consistent with the Code of Civil Procedure of the PRC.

- 10 -

9. Lastly, the plaintiffs assert that when counsel for CB&P signed and filed herein on April 22, 1987 his pleading as an attorney of the bar of this Court, wherein he urged on behalf of the remaining defendants that this action be dismissed as to the remaining defendants, such action on his part constituted an appearance on behalf of those defendants under SCR, Civ. 101(b)(1), and he thereby became for the purpose of the FSIA an agent author - by law to receive service of process on behalf of those defendants under 28 U.S.C. 1608(b). The plaintiffs assert that summons and complaint, as to each remaining defendant, was served on counsel on April 24, 1987 in open court after a hearing in this case.

The plaintiffs also assert that the defendants, based on the protests of the PRC, have actual knowledge of the pendency of this action.

III. Analysis of Efforts to Serve Process.

A. FSIA. The only provision of the FSIA under which service of process could possibly have been effected in this case is that section permitting service by mail requiring a signed receipt. Under those provisions, service must be effected by the Clerk forwarding to the agency or instrumentality to be served a copy of the Summons and Complaint together with a translation into the official language of the foreign state by mail requiring a signed receipt, provided that such service is reasonably calculated to give to the agency or instrumentality actual notice of the action. 28 U.S.C. 1608(b). The only action that might possibly be adequate to comply with these provisions are those efforts undertaken by the Clerk's

- 11 -

Office on June 14, 1986. The problem is, however, that no signed receipt has ever been received back by the clerk's office which raises some question as to whether those efforts were in fact and law successful in effecting service of process, for

The Act provides that:

(c) Service shall be deemed to have been made –

(2) in any other case under this section, as of the date of receipt indicated in the certification, signed and returned, or postal receipt or other proof of service applicable to the method of service employed.

(28 U.S.C. 1608(c)(2))

It is clear, however, that proof of service under Section 1608 of the Act may be by evidence consisting of either a signed and returned postal receipt or other evidence sufficient to permit the Court to reasonably determine that the summons and complaint have in fact been received by the agency or instrumentality in question.

B. Rules of this Court.

Since the individual defendants are neither a foreign state nor an instrumentability or agency thereof, service may not be effected on them under the FSIA. Service as to them must be effected in accordance with SCR Civ 4 which provides in relevant part as follows:

(e) SAME: SERVICE UPON PARTY NOT INHABITANT OF OR FOUND WITHIN DISTRICT OF COLUMBIA. Whenever an applicable statute or rule of court provides (1) for service of a summons, or of a notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the District of Columbia, or (2) for service upon or notice to him to appear and respond or defend in an action by reason of the attachment or garnishment or similar seizure of his property located within the District of Columbia, service may in either case be made under the circumstances and in the manner prescribed in the statute or rule.

– 12 –

(i)  ALTERNATIVE PROVISIONS FOR SERVICE IN A
FOREIGN COUNTRY.
(1)  MANNER.  When the applicable law
referred to in subdivision (e) of this
rule authorizes service upon a party not an
inhabitant of or found within the District
of Columbia, and service is to be effected
upon the party in a foreign country, it is
also sufficient if service of the summons
and complaint is made:  (A)  in the manner
prescribed by the law of the foreign country
for service in that country in an action in
any of its courts of general jurisdiction;
or (B)  as directed by the foreign authority
in response to a letter rogatory, when
service in either case is reasonably
calculated to give actual notice; or (C)
upon an individual, by delivery to him
personally, and upon a corporation or
partnership or association, by delivery to
an officer, a managing or general agent; or
(D)  by any form of mail, requiring a signed
receipt, to be addressed and dispatched by
the clerk of the court to the party to be
served; or (E)  as directed by order of the
court.  Service under (C) or (E) above may
be made by any person who is not a party and
is not less than 18 years of age or who is
designated by order of this court or by the
foreign court.  On request, the clerk shall
deliver the summons to the plaintiff for
transmission to the person or the foreign
court or officer who will make the service.
(2)  RETURN.  Proof of service may be
made as prescribed by subdivision (g) of
this rule, or by the law of the foreign
country, or by order of the court.  When
service is made pursuant to subparagraph
(1)(D) of this subdivision, proof of service
shall include a receipt signed by the
addressee or other evidence of personal
delivery to the addressee satisfactory to
the court.

It is clear that the provisions of this Rule permit

the service of process on the individual defendants in

this case in virtually the same manner that service

may be effected under the FSIA as to an

instrumentality or agency of a foreign state.  In

addition, proof of service may be by receipt signed by

the person to be served or by other proof of personal

delivery satisfactory to the court.  SCR Civ 4(i)(2).

These Rule provisions make service and proof thereof

as to the individuals virtually identical to service

and proof thereof as to RR.

- 13 -

## C. Perfection of service.

As previously pointed out, the plaintiffs have not filed receipts signed by or on behalf of the defendants with respect to the mailing by the clerk's office of June 14, 1986. The plaintiffs have, however, proffered conclusive proof otherwise from which the court reasonably concludes that the envelope addressed to RR and mailed by the clerk's office on June 14, 1986, has in fact been received by that defendant. No proof, however, has been proffered to reasonably show that envelopes addressed to the individual defendants and also mailed by the clerk's office on June 14, 1986, were personally delivered to and received by those individual defendants. In the first place, none of the envelopes have been returned to the court. Secondly, it was reported on one occasion that the envelopes or their contents were considered by the PRC to be contraband, and they were confiscated. Since RR is a government instrumentality or agency, the very confiscation of the envelopes constitutes service as to RR but not as to the individual defendants. In addition, the initial protest to the State Department from the PRC with respect to his case occurred on December 14, 1985. Although there was no signed receipt with respect to counsel's mailing of November 29, 1985, none of the envelopes were returned, and they must have been received by the PRC, for it was clearly the receipt of those mailings that brought the PRC's protest of December 14, 1985, to the U.S. Embassy. In addition, the U.S. Postal Service has reported that the PRC authorities reported to it that the letters mailed November 29, 1985 to RR, Director Qin Chuan, Deng

- 14 -

Liqun and Li Zhuang had all been delivered to the proper person, but that the letter addressed to the reporter, Cui Chen had been confiscated for the reason that its contents were prohibited in the mails of the PRC. Based on all of these circumstances, the Court finds that even in absence of a signed receipt, the summons and complaint addressed to RR and mailed by the clerk on June 14, 1986 to RR were received by the PRC and, therefore, RR. See: <u>United EURAM v. U. of Soviet Socialist Republics</u>, 461 F.Supp. 609 (1978). Conversely, it appears to the Court from all of the evidence that the envelopes addressed to the individual defendants were together with their contents confiscated by the PRC and not received by those individual defendants, and the Court so finds.

IV.  Alternative Theories of Service of Process.

A.  Service on RR by service on officer.

The plaintiffs have also asserted service of process as to RR under an alternate theory. The plaintiffs assert that process was served on RR by service of process on Mr. Fan Ron Kang, Deputy Chief Editor for RR, responsible for the U.S. Edition of RR first at LaGuardia Airport and then at Dulles Airport. The plaintiffs assert that Mr. Kang was an <u>officer of RR</u>, but there is no affidavit or other evidence tending to so indicate. The plaintiffs assert that these attempts were successful, because such service was authorized by the FSIA. As to such attempted service, the FSIA provides that process may be served on an instrumentality or agency of a foreign state, among other ways, as follows:

> (2)  if no special arrangements exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States ... (28 U.S.C. 1608(b)).

- 15 -

The Court finds, however, that there is no law that the plaintiffs have cited, nor that the court has found that would permit the service of process on RR by delivery of summons and complaint to Mr. Kang at Dulles or LaGuardia Airport.

    B.   Service on RR under Long Arm Statute of the District of Columbia.

The plaintiffs then assert that they have effected service of process on RR under the Long Arm Statute of the District of Columbia. This is a two-step argument. 1. D.C. Code § 13-421 (1981) defines a person as: .... an individual .... or a corporation, partnerships, association, or any other legal or commercial entity, whether or not a citizen or domiciliary of the District of Columbia and whether or not organized under the laws of the District of Columbia." The implication being that the above definition of a person is broad enough to include an instrumentality or agency of a foreign state, such as RR, particularly as: "a corporation, partnership, association or any other legal entity."

    2.  D.C. Code § 13-431 provides:

    (a)  When the law of the District of Columbia authorizes service outside the District of Columbia, the service, when reasonably calculated to give actual notice, may be made — (1) by personal delivery in the manner prescribed for service within the District of Columbia;

    . . . . . . . .

    (b)  Proof of service outside the District of Columbia may be made by affidavit of the individual who made the service or in the manner prescribed by the law of the District of Columbia, the order pursuant to which the service is made, or the law of the place in which the service is made for proof of service in a action in any of its courts of general jurisdiction. When service is made by mail, proof of service shall include a receipt signed by the addressee or other evidence of personal delivery to the addressee satisfactory to the court.

- 16 -

Under this theory, the plaintiffs are assuming that there is some independent basis under the Long Arm Statute of the District of Columbia, D.C. Code § 13-421 et seq. (1981), for the court to exercise jurisdiction over RR.  The Court, however, rejects this assumption by the plaintiffs and holds that the law of the District of Columbia, although subject to legislative oversight by the United States, is strictly local in application and like the law of the several States cannot be used as the independent basis for a court's jurisdiction, personal or otherwise, with respect to actions against a foreign state or its instrumentalities or agencies.  The FSIA is the exclusive basis upon which this court or any other court of the United States can exercise jurisdiction of any action against any foreign state or any of its instrumentalities or agencies.  The FSIA provides that:

§ 1602.  Findings and declaration of purpose

The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts.  Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities.  Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter.  (Emphasis Added)

See: Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480 (1983).  As previously pointed out, under the FSIA, unless it indicates otherwise the term foreign state includes an instrumentality or agency of a foreign state and as has been shown RR is an instrumentality of agency of a foreign state, the PRC. (See 28 U.S.C. 1603(a)(b)).

- 17 -

The FSIA then provides that:  ...

... <u>a foreign state shall be immuned</u>

<u>from the jurisdiction of the courts of the</u>
<u>U.S. and of the states except as provided in</u>
<u>sections 1605 to 1607 of this chapter.</u>
(Emphasis Added) (28 U.S.C. 1604)

It is clear that FSIA provides not only the
method of effecting service of process in cases
involving agencies or instrumentalities of a foreign
state, but in addition, it provides the types of cases
in which the courts of the United States and the
States may exercise jurisdiction as to a foreign state
or instrumentality or agency thereof.  As to RR, then
the FSIA is the exclusive basis of this court's
jurisdiction both as to service of process and as to
subject matter and before this court can exercise
jurisdiction or grant a default judgment as to a
foreign state or an instrumentality or agency thereof,
a plaintiff must establish by evidence satisfactory to
the court both subject matter jurisdiction and service
of process in conformity with the FSIA.

C.  Service on RR under Rules of this Court.

The plaintiffs then assert that service of process
has been effected as to RR pursuant to SCR Civ 4(d)(3)
and 4(i)(c).

SCR Civ 4(d)(3) provides that service of process
may be effected on a domestic or foreign corporation,
partnership or other unincorporated association which
is subject to suit under a common name by delivering a
copy of the summons and complaint to an officer,
managing agent or other agent authorized by
appointment, law or statute to receive service of
process.  Rule 4(d) does not relate to the other
factors involved in perfecting service of process such
as where and by what means such service is perfected
and, therefore, is insufficient as an independent
basis for effecting service of process in this case

- 18 -

SCR Civ Rule 4(d) is a general rule as to service of process, but it must be used with some other provision as a basis for effecting service of process. This Rule is neither needed nor applicable as a basis for service of process in this case in light of not only the specific but also the exclusive provisions of the FSIA relating to service in the case of an agency or instrumentality of a foreign state. In addition, as to the specific case of service of process outside of the District of Columbia, SCR Civ 4(e) provides that outside of the District of Columbia process may only be served "under the circumstances and in the manner prescribed in the statute of rule." As has been pointed out, the FSIA not only prescribes the circumstances and manner of service of process, but does so to the exclusion of all other the provisions of law, including the Long Arm Statute of the District of Columbia.

SCR Civ 4(i) merely provides that if a statute or rule permits service of process from this court on a party who is not an inhabitant of the District of Columbia and service is to be effected in a foreign country, service may be effected in a variety of alternative ways which are essentially identical to the manner of service under the FSIA. Rule 4(i) also provides for the manner of proof of service when service is made under its provisions which are virtually identical with the FSIA. To the extent that any authority aside from the FSIA is needed for the validity of the service of the court's summons in a foreign state, SCR Civ 4(e) and (i) furnish that authority. By the terms of these Rules, however, the statute i.e., in this case FSIA controls.

As has been pointed out, however, FSIA and SCR Civ 4(i) are virtually identical. Rule 4(i), however,

- 19 -

specifically provides that in the case of delivery of summons and complaint by mail requiring a signed receipt to be addressed and dispatched by the clerk of the court to the party to be served, proof of such service shall include a receipt signed by the addressee or other evidence of personal delivery to the addressee satisfactory to the court. The court's conclusion, therefore, that under the FSIA proof of service by mail requiring signed receipt may be by signed receipt or by other evidence satisfactory to the court is entirely consistent with SCR Civ 4(i).

D. Service on all defendants by delivery of Summons and Complaint to Eugene Theroux, Esquire.

The plaintiffs then assert that service of process was effected as to all remaining defendants by delivery in court of summons and complaint for each such defendant to Eugene Theroux, Esquire. The plaintiffs assert that pursuant to SCR Civ 101(b)(3) Mr. Theroux entered an appearance in this case on behalf of these defendants by filing on April 22, 1987 with the clerk of this court the pleading: Affidavit of Eugene Theroux And Suggestion of Lack of Subject Matter Jurisdiction. In addition, the plaintiffs assert that Mr. Theroux argued on April 24, 1987 in open court in support of that Affidavit. The plaintiffs assert that Affidavit is actually, immediately and obviously a motion to dismiss the complaint as to the remaining defendants. The plaintiffs assert that under SCR Civ 101(b) an attorney who signs and files any pleading on behalf a party enters an appearance on behalf of that party and thereby becomes an agent under the FSIA authori[z] by law upon whom delivery of service of process may made for the purpose of effecting service of proce[ss] on the remaining defendants.

- 20 -

In the first place, the FSIA has no application to the individuals. In the second place, even if under SCR Civ 101(b), by filing the Affidavit, Mr. Theroux entered an appearance for RR he did not thereby become an agent authorized by law to whom summons and complaint could be delivered for the purpose of effecting service of process under the FSIA on RR. No such result follows from either Rule 101 or the FSIA or any other statute or law. Rule 101(b) simply provides for the manner by which attorneys may appear and withdraw as counsel for a party in a case and has nothing to do with appointing an attorney as an agent to whom summons and complaint may be delivered to effect service of process. Urciolo v. Urciolo, 449 A.2d 287 (D.C. 1982). In addition, SCR Civ 5, specifically provides that any pleading subsequent to the original complaint may be served on a party represented by counsel by serving such party's counsel.

The plaintiffs also assert that pursuant to R. 101(b), Mr. Theroux also became an agent authorized by law to receive service of process under SCR Civ 4(d)(3), but as has been pointed out, SCR Civ 101(b) has no such effect.

V. Court's Personal jurisdiction of the individual defendants.

In this case, the individual defendants are not residents of the District of Columbia, and, probably have never been in the District of Columbia and any activities of their part which may have had any contact with the plaintiffs', RR, or its presence in the District of Columbia all occurred in the PRC, so far as the record in this case is concerned. This

- 21 -

Court's jurisdiction as to these individual defendants must then be based on D.C. Code § 13-423 (1981) (Long Arm Statute). The record in this case only supports the conclusion that the individual defendants in relationship to the plaintiffs claims, have never transacted any business in the District of Columbia, have never contracted to supply services in the District of Columbia and have clearly never engaged in any of the other activities upon which this court could under the Long Arm Statute assert personal jurisdiction over them. The plaintiffs do not in their Motion suggest any basis upon which the Court could assert personal jurisdiction over them. The plaintiffs do not in their Motion suggest any basis upon which the court could assert personal jurisdiction over the individual defendants, but this question has not really been raised before and for that reason not really addressed by the plaintiffs. There could be some possibility that one could assert in this case that an individual's actions in the PRC in connection with the paper in question could have actually been committed in the District of Columbia and have caused tortious injury in the District of Columbia and such individual is, therefore, for that reason alone subject to the personal jurisdiction of the court in this case. See: D.C. Code § 13-423(a)(3). Any activities normally associated with the preparation and publication of a newspaper in another jurisdiction which is then shipped from that jurisdiction to the District of Columbia are not considered acts committed within the District of Columbia. Moncrief v. Lexington Herald-Leader Co., 631 F.Supp. 772 (D.C. 1985).

- 22 -

In 1984, the following undisputed circumstances existed as to RR's activities as a newspaper in the United States as Reported in Mr. Christopher Noyes' Affidavit of February 4, 1986:

14.  The circulation of <u>Renmin Ribao</u> for the month of December, 1984, was as follows:

a.  Total number of copies printed (for the United States and Canada): 340,000;

b.  Total number of copies mailed to paid subscribers in the United States: 45,570;

c.  Total number of copies mailed to scholars from the People's Republic of China studying in the United States: 255,626;

d.  Total number of copies mailed to diplomatic representatives of the People's Republic of China in the United States: 5,053;

e.  Total number of copies sold in the United States by means other than by mail: 213;

f.  Gross revenue to China Books from papers mailed or sold in the United States: $10,726.17;

g.  Gross revenue to China Books from paid advertising, including from U.S. advertisers: $0;

h.  Total number of copies mailed or sold to the District of Columbia:

   (i)    to paid subscribers: 837;

   (ii)   to scholars from the People's Republic of China studying in the United States and resident in the District of Columbia: 3,968;

   (iii)  to diplomatic representatives of the People's Republic of China resident in the District of Columbia: 2,573;

   (iv)   to vendors in the District of Columbia: 0;

i.  Gross revenue to China Books from all papers mailed or sold to the District of Columbia: $258.33;

j.  Gross revenues to China Books from paid advertising by advertisers within the District of Columbia: $0.

15.  The circulation of <u>Renmin Ribao</u> for the year 1984 was as follows:

a.  Total number of copies printed (for the United States and Canada): 3,398,462;

b.  Total number of copies mailed to paid subscribers in the United States: 432,694;

- 23 -

c. Total number of copies mailed to scholars from the People's Republic of China studying in the United States: 2,566,858;

d. Total number of copies mailed to diplomatic representatives of the People's Republic of China in the United States: 59,658;

e. Total number of copies sold by means other than by mail in the United States: 2,068;

f. Gross revenue to China Books from papers mailed or sold in the United States: $107,154.18;

g. Gross revenue to China Books from paid advertising, including from U.S. advertisers: $0;

h. Total number of copies mailed or sold to the District of Columbia:

   (i)   to paid subscribers: 8,226;

   (ii)  to scholars from the People's Republic of China studying in the United States and resident in the District of Columbia: 30,378;

   (iii) to diplomatic representatives of the People's Republic of China resident in the District of Columbia: 30,378;

   (iv)  to vendors in the District of Columbia: 0.

i. Gross revenue to China books from all papers mailed or sold to the District of Columbia: $2,923.34;

j. Gross revenues to China Books from paid advertising by advertisers within the District of Columbia: 0.

16. The gross revenues of China Books for China Books' fiscal year 1985 (August 1, 1984 -- July 31, 1985) were as follows:

a. Total U.S. and Canadian Revenue: $2,964,462.00;

b. Total revenue derived from the District of Columbia: $30,843.05.

17. The gross revenues of China Books for the month December, 1984, were as follows:

   a. Total U.S. and Canadian revenue: $278,578.17;

   b. Total revenue derived from the District of Columbia: $3,314.06.

- 24 -

From the above circumstances, it appears to be
fairly clear that the newspaper itself was (with
respect to the activities giving rise to the
plaintiffs' claims) transacting business in the
District of Columbia.  As to personal jurisdiction of
a non-resident defendant based upon that defendant
transacting business in the District of Columbia, the
Long Arm Statute requires those minimum contacts
between that defendant and the District of Columbia
which are required by Constitutional Due Process.
Mouzvaries v. Baxter, 434 A.2d 988 (1981).  A
non-resident newspaper who engages in the types of
activities set out above with respect to the
defendant, RR, is subject to personal jurisdiction in
the District of Columbia consistent with
Constitutional Due Process and, therefore, with the
Long Arm Statute of the District of Columbia.  Keeton
v. Hustler Magazine, Inc., 465 U.S. 770 (1984).  The
mere fact, however, that the newspaper is subject to
the personal jurisdiction of the Court under the Long
Arm Statute does not mean that the individuals in this
case, the employees or officers of the newspaper, are
subject to the personal jurisdiction of the court
under the Long Arm Statute.  The newspaper and its
employees must be evaluated separately.  Id. p. 781.
While it is clear that non-resident reporters and
editors who write, compile and edit a libelous article
in one jurisdiction with the intent and for the
purpose of injuring a person in another jurisdiction
are consistent with Constitutional Due Process of law
subject to personal jurisdiction in such other
jurisdiction where injury may occur, it is not at all
clear that the Long Arm Statute of the District of

- 25 -

Columbia would permit this court to exercise such personal jurisdiction if injury is alleged to have been so caused in the District of Columbia. See: Calder v. Jones, 465 U.S. 782 (1984), where the California Long Arm Statute did not distinguish between acts or omissions occurring out of state and those occurring in state. The court expresses no conclusion as to whether personal jurisdiction could be exercised over the individual defendants in this case. At this time, there is no valid service of process with respect to any of these individual defendants.

VI. Court's subject matter jurisdiction of the plaintiffs claim against RR.

The court can only exercise jurisdiction over RR with respect to its commerical activities carried on in the United States or elsewhere if those commercial activities carried on elsewhere have a direct effect in the United States. 28 U.S.C. 1605. As has been pointed out, RR is an organ of the CCP which holds and exercises all of the political power of the PRC. RR disseminates the official position of the PRC and is an organ through which only the PRC speaks. RR is not independent of the PRC, but instead is used by the PRC to report its official political positions on any matter and to inform the people of the PRC and of the other places where the paper is disseminated such as the United States of its version of events. The distribution of such an official newspaper of a foreign state, even though in some instances a per copy price is charged to its purchasers or subscribers, does not constitute a commercial activity but a governmental activity.

The plaintiff has urged and asserted that no

- 26 -

questions regarding the Court's jurisdiction aside
from whether there has been service of process can be
considered by the court. This is because J. Salzman,
in his Order of June 2, 1986, concluded that any
questions regarding the court's jurisdiction must
await service of process on the defendants, entry into
the case by the defendants, and then some action by a
defendant to raise that question. The plaintiffs
assert that this ruling is the law of this case and
prevents the examination by the court of its
jurisdiction save under the circumstances outlined in
that Ruling or the circumstances permissible under the
"law of the case doctrine." (Plaintiffs Response To
Eugene Theroux's Affidavit of June 8, 1987, etc. pp.
5-6). The plaintiffs assert that this prior ruling
applies and the law of the case doctrine applies as
much with respect to the individuals as with respect
to the newspaper.

Counsel for CB&P filed in his personal capacity
two Affidavits in this case, one on April 22, 1987
with accompanying attachments and one of June 8, 1987.
In both of the Affidavits, Mr. Theroux asserts that
this court lacks jurisdiction of RR, because under the
FSIA, foreign states and their agencies and
instrumentalities are granted immunity with respect
to, among other actions, actions for libel or slander.
In Georgian v. Izvestia, CV 85-0100-KN (U.S.D.C., D.C.
Cal., April 5, 1987) the Court held that due to the
FSIA it lacked subject matter jurisdiction of a libel
action sought to be asserted against the Soviet
newspaper Izvestia.

This Court holds that when the court previously
held that lack of subject matter jurisdiction based on
sovereign immunity is not ripe for resolution until a

- 27 -

foreign state or its agency or instrumentality appears
and raises it is clearly erroneous and must not be
followed.  In Prolova v. Union of Soviet Socialist
Republics, 761 F.2d 370 (7th Cir. 1985), the Court
said at p. 373:

> Because the absences of sovereign
> immunity is a prerequisite to subject
> matter jurisdiction, the question of
> immunity must be considered by a district
> court even though the foreign country
> whose immunity is at issue has not
> entered an appearance.  Verlinden, 461
> U.S. at 493 n. 20, 103 S.Ct. at 1971
> n. 20.

In this case, in order for this court to exercise
subject matter jurisdiction of RR, it must appear that
this action falls in one of the exceptions to
sovereign immunity set out in the FSIA.  Verlinden
B.V., supra, at p. 489.  The only possible exception
to sovereign immunity that might be applicable to this
case is that the plaintiffs' claims are either based on
commercial activity carried on in the United States or
in connection with commercial activity carried on
elsewhere (28 U.S.C. 1695(a)(2)).  In either case:
"The Commercial character of an activity shall be
determined by reference to the nature of the course of
conduct or particular transaction or act, rather than
by reference to its purpose."  28 U.S.C. 1603(d).
Given the basic facts in this case as they relate to
RR and the alleged libelous article which is the
subject matter of this case, there is considerable
question as to whether the court has subject matter
jurisdiction of the plaintiffs' claims against RR.
See:  Yessenin-Volpin v. Novosti Press Agcy., 443 F.
Supp. 849 (1978).

ACCORDINGLY, the plaintiffs' Motion for Default
is DENIED as to all defendants.  In addition, the
plaintiffs are:

- 28 -

ORDERED to address in a Brief to be filed within twenty (20) days of the date of this Order, the following specific questions:

1. Can this court assert personal jurisdiction under the Long Arm Statute as to the individual defendants in this case?

2. Is it reasonable to expect to be able to obtain service of process on the individual defendants in the foreseeable future?

3. Does this court have subject matter jurisdiction as to RR?

SO ORDERED.

_____
Eugene N. Hamilton
Judge

November _10_, 1987

Copies to be mailed to:

Robert A. Ackerman, Esquire
Suite 504W
1250 Fourth Street, S.W.
Washington, D.C. 20024

Eugene Theroux, Esquire
Thomas Peele, Esquire
Baker & McKenzie
815 Connecticut Avenue, N.W.
Washington, D.C. 20006

Renmin Ribao
2 Jintai Road West
Beijing
People's Republic of China

Mr. Li Zhuang
Editor-in-Chief
Renmin Ribao
2 Jintai Road West
Beijing
People's Republic of China

Mr. Deng Liqun
c/o Renmin Ribao Publishing House
2 Jintai Road West
Beijing
People's Republic of China

Mr. Qin Chuan
c/o Renmin Ribao Publishing House
2 Jintai Road West
Beijing
People's Republic of China

- 29 -

Mr. Cui Chen
c/o Renmin Ribao Publishing House
2 Jintai Road West
Beijing
People's Republic of China

Mr. He Jian Xiong
Embassy of the People's Republic of China
2300 Connecticut Avenue, N.W.
Washington, D.C. 20008

Mr. Zhang Liang
3706 Massachusetts Avenue, N.W.
Washington, D.C. 20016

Mr. Fan Rong Kang
Deputy Chief Editor
Renmin Ribao
2 Jintai Road West
Beijing
People's Republic of China

- 30 -



SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

Civil Division

WANG BINGZHANG, et al.,

      Plaintiffs,

      v.

RENMIN RIBAO, et al.,

      Defendants.

Civil Action No. 8645-85

Civil I - Judge Greene

## ORDER

    This matter came before the court for a hearing on (1) Plaintiffs' Motion to Strike Mr. Theoroux' Purported December 31, 1988 Filing and His Personal Letter to Judge Hamilton for Failure to Enter Appearance; (2) Plaintiffs' Renewed Motion for Default Judgement as to Renmin Ribao; and (3) the suggestion of Eugene Theoroux, Esquire, a member of the District of Columbia Bar, in a letter of December 31, 1987, to Judge Hamilton and in opposition to plaintiffs' Motion to Strike Suggestion of Lack of Jurisdiction, that this court is without subject matter jurisdiction over this case.

    After hearing lengthy argument from counsel, and for the reasons stated orally on the record in open court, it is this _11th_ day of February, 1988, hereby

-2-

ORDERED that Plaintiffs' Motion to Strike Mr. Theoroux' Purported December 31, 1988 Filing and His Personal Letter to Judge Hamilton for Failure to Enter Appearance be, and it hereby is, denied; and it is further

ORDERED that Plaintiffs' Renewed Motion for Default Judgment as to Renmin Ribao be, and it hereby is, denied; and it is further

ORDERED that plaintiffs' complaint be, and it hereby is, dismissed with prejudice for (1) lack of subject matter jurisdiction as to all defendants, and (2) lack of personal jurisdiction over all defendants other than Renmin Ribao.

HENRY F. GREENE, JUDGE

Copies mailed to:

Robert A. Ackerman, Esquire
1250 4th Street, S.W. #504W
Washington, D.C. 20024

Eugene Theroux, Esquire
815 Connecticut Avenue, N.W.
Washington, D.C. 20006



# 企业法人营业执照

（副本）

注册号 1101051232686 （1—1）

企业名称 《环球时报》社

住　　所 北京市朝阳区金台西路2号

法定代表人 胡锡进

注册资金 1000万元

经济性质 全民所有制

经营方式 ＊　＊　＊

经营范围 主管编辑、出版报纸；信息咨询服务；组织展览销售活动，组织新闻发布会。＊　＊　＊

兼营

发照机关

成立日期 1998年07月

2005 年 12 月 29 日



## 企业法人须知

根据《中华人民共和国企业法人登记管理条例》的有关规定，企业法人应遵守下列规定：

一、企业经登记主管机关核准登记注册，领取《企业法人营业执照》即取得法人资格。企业法人凭营业执照可以刻制公章、开立银行帐户、签订合同，进行经营活动。

二、企业法人应当在核准登记的经营范围内从事经营活动。

三、企业法人改变名称、住所、经济性质、法定代表人、经济类型、经营范围、经营方式、经营期限、以及增设或者撤销分支机构，应向登记主管机关申请办理变更登记。

四、企业法人分立、合并、迁移，应向登记主管机关办理变更登记、开业登记或者注销登记。

五、企业法人歇业、被撤销、被解散、宣告破产或者其他原因终止营业，应向登记主管机关办理注销登记。

六、企业法人领取企业法人营业执照后，满两个月尚未开展经营活动或者停止经营活动满一年的，视同歇业，登记主管机关应收缴《企业法人营业执照》及其副本和公章。

七、企业法人每年应当在规定的期限内向登记主管机关提交年检报告书、资金平衡表或者资产负债表，办理年度检验。

八、禁止伪造、涂改、出租、出借、转让《企业法人营业执照》。企业法人的《营业执照》被吊销或者被撤销执照的，是企业违法人无证，除经登记主管机关依法核准并办理注销登记外，任何单位和个人不得伪造、涂改、出租、出借、转让、出卖。出卖执照及其副本，不得伪造、涂改、出租、出借、自行印制。

## 企业法人年度检验情况



| | |
|---|---|
| 2004年度 | 年检章  年 月 日 |
| 2005年度 | 年检章  年 月 日 |
| 年度 | 年检章  年 月 日 |
| 年度 | 年检章  年 月 日 |
| 年度 | 年检章  年 月 日 |

BUSINESS LICENSE OF THE ENTERPRISE AS A JURIDICAL PERSON

(Translation)

Register Number: 1101051232686(1-1)

Name of the Enterprise: Global Times

Address: No.2 Jintai Xilu, Chaoyang District, Beijing

Legal Representative: HU Xijin

Register Capital: 10million RMB (about USD1.25million)

Enterprise Type: State ownership

Scope of Business: Newspaper editing and publishing; Information consulting
service: Organization of exhibitions and trade fairs; Organization of press
conferences.

Date of Founding: 7th July 1994

Issued By: The Chaoyang District Bureau of Beijing Industrial and Commercial
Administration (seal)

Issuing Date: 19th December 2005